# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CASE NO. 3:23-CR-091-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| DEKATO BERNARD GIBSON, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER IS BEFORE THE COURT** on "Defendant's Motion To Suppress And Memorandum Of Law" (Document No. 18) filed September 20, 2023. The "United States of America's Response In Opposition To Defendant's Motion To Suppress" (Document No. 22) was filed on October 4, 2023. An evidentiary hearing was held before the undersigned on November 15, 2023, with Defendant personally present with counsel. Having carefully considered the briefs, testimony, and oral arguments, the undersigned will respectfully recommend that the motion be denied.

## I.  PROCEDURAL HISTORY

On April 18, 2023, Defendant Dekato Bernard Gibson ("Defendant" or "Gibson") was indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Document No. 1). Defendant, through counsel, filed "Defendant's Motion To Suppress And Memorandum Of Law" (Document No. 18) on September 20, 2023, seeking to suppress certain Government evidence in the case. The "United States of America's Response In Opposition To Defendant's Motion To Suppress" (Document No. 22) was filed on October 4, 2023. Defendant filed "Defendant's Reply To The Government's Response To Defendant's Motion To Suppress"

(Document No. 27) on October 24, 2023 at the Court's direction. The Court further directed that the Government file a surreply brief addressing the possible application of United States v. Teasley, 3:22-CR-083-FDW-DCK to this case. The "United States Of America's Surreply In Opposition To Defendant's Motion To Suppress" (Document No. 32) was filed November 9, 2023. The Court noticed a hearing on the matter.

The motion came on for a hearing on November 15, 2023, at which time several witnesses were presented by the prosecution and cross-examined by the defense. The principal questions presented by Defendant's motion are whether, based upon the information available to them, law enforcement had (1) reasonable suspicion to stop Defendant's car and briefly detain him in the back of a patrol car, and (2) probable cause to conduct a search of Defendant's car. It was that search that ultimately led to the seizure of the firearm that forms the basis of the charge in this case.

## II. FACTUAL SUMMARY

As noted, the Court conducted a hearing in this matter on November 15, 2023, at which the Government presented witness testimony and both the Government and Defendant presented argument. The Government presented the testimony of three law enforcement officers – Officers Zachary Cahall ("Cahall"), Robert Ahlers ("Ahlers"), and Gregory J. Crittendon, Jr. ("Crittendon") of the Charlotte-Mecklenburg Police Department ("CMPD"). Evidence also included cross-examination of the witnesses, presentation of body-worn camera footage from each of the officers, and presentation of various maps of the area of the traffic stop, an excerpt from the North Carolina Drivers' Handbook, and police reports and narratives written by the aforementioned officers.

First, the Government presented the testimony of Officer Zachary Cahall. Officer Cahall has been employed with CMPD since October 2019 as a patrol officer in the Hickory Grove

Division. Prior to his current employment with CMPD, Officer Cahall was in the military for fifteen years, part of which he spent as a military police officer. The Government asked Officer Cahall about the incident with Defendant that occurred on the night of June 10, 2022. Officer Cahall recalled that the stop occurred between 11:30 pm and midnight. Officer Cahall was driving westbound on Robinson Church Road when a vehicle traveling in the opposite lane (and thus approaching him) ran off the road into a ditch and almost hit a mailbox. The vehicle, Officer Cahall testified, then came back onto the road and proceeded to drive. At that moment, Officer Cahall made the decision to do a U-turn in order to catch up to the vehicle and initiate a traffic stop on account of the unsafe driving and running off the road. Defendant's vehicle turned into a residential neighborhood, onto Atlas Cedar Drive. Somewhere between Atlas Cedar and the next street, Weeping Fig Lane, Officer Cahall turned on his blue lights. Defendant apparently was traveling under the speed limit, but was slow-rolling – in other words, Officer Cahall described, he was not stopping despite his efforts to initiate a traffic stop. Defendant ultimately stopped at three stop signs, but at each one, he then continued driving. Officer Cahall activated his sirens to make his intentions as clear as possible. He also called for assistance, telling dispatch that a vehicle ran off the road and now didn't appear as if it was going to stop.

Eventually, Defendant stopped on Goldenwillow Drive – after, as Officer Cahall testified, passing multiple appropriate places where it would have been safe to stop. At that point, the body-worn camera had been playing for a little under two and a half minutes, at which point Defendant's car came to a stop. Officer Cahall observed furtive moments on the driver's side inside the car. The Government pointed out that about two and a half minutes had elapsed since Officer Cahall's body-worn camera began playing and since the first attempt to initiate the traffic stop began. As the body-worn camera footage shows, Officer Cahall stepped out of his patrol car with a firearm

3

drawn, standing behind the open door of his own car and yelled to Defendant to get out of his car. He ordered Defendant to walk backwards, with his hands above his head, and to drop to his knees while awaiting backup.

At this point, Officer Ahlers arrived. Officer Ahlers handcuffed Defendant and detained him in the back of a patrol car. Officer Ahlers then returned to Defendant's vehicle, and he opened the driver's side door – notably, the window on the driver's side door was already down. In plain view, as is apparent from the body-worn camera footage, a red Solo cup sits in the center cupholder on the driver's side. Officer Ahlers began his search of the car, assisted by Officer Crittendon. This search resulted in discovery of a firearm in the center console, discussed in greater detail in the summary of Officer Ahlers' testimony.

Officer Cahall, meanwhile, had ordered the passenger out of the vehicle, also at gunpoint and in the same manner as Defendant. He similarly detained the female passenger, asking why Defendant did not stop the car and what occurred earlier with the driving off the side of the road. The passenger stated that Defendant had dropped his phone down on the passenger side, reached to grab it, and veered off into the ditch. Regarding the failure to stop, she said that she told him to pull over once it was safe and once there were fewer cars parked on the road. At this point, family members of Defendant appeared on the sidewalk and began to ask questions about the investigation. Officer Cahall returned to the patrol car to talk to Defendant, asking him about what occurred and why he didn't stop. Defendant stated that he drove into a ditch because of a power steering issue with the truck. Officer Cahall testified that during this interaction, he could at this point smell alcohol on Defendant. Officer Cahall asked Defendant where he was coming from that evening, to which Defendant responded that his girlfriend had a birthday party for her six-year-old son. At no point did Defendant tell Officer Cahall that there was a gun in the car. Officer

4

Cahall then told Defendant that he would make sure everything was good, and then he would try to get him out of there. During this time, Officer Cahall was running Defendant's driver's license through a criminal history check, which included a check to see whether there were any outstanding warrants for Defendant's arrest. He learned that there was a warrant for Defendant's arrest from Cabarrus County.

Officer Cahall walked towards the truck, where Officers Ahlers and Crittendon were completing their search of the vehicle. At this point, Officer Cahall looked past where Officer Ahlers was standing in front of the truck and saw a red Solo cup in the center cupholder. Officer Cahall asked if it was an open container. Officer Ahlers shined his flashlight towards the passenger floorboard, while Officer Crittendon looked on the floor. Officer Cahall then redirected their attention to the Solo cup, to which Officer Ahlers responded in the affirmative after picking it up and smelling it. Officer Crittendon also confirmed at that point that he could smell the alcohol in the cup. Officer Cahall walked back towards his truck with Defendant's driver's license and ran the relevant criminal history checks. After learning that the gun found in the car was stolen and that there was a warrant for Defendant's arrest, Officer Cahall arrested Defendant for possession of firearm by a felon, carrying a concealed firearm, and possession of a stolen firearm. Officer Cahall testified that he decided not to arrest Defendant for alcohol-related charges on account of the more serious gun charges. He also did not perform a field sobriety test – and neither did any other officer – because the discovery of the gun and Defendant's status as a convicted felon changed the circumstances of the stop. The cup was also not tested for alcohol or preserved, despite various officers testifying that it did, in fact, smell of alcohol.

On cross-examination of Officer Cahall, Defendant's counsel inquired about whether the average motorist was aware that once an officer triggered his or her blue lights, that meant that the

5

Case 3:23-cr-00091-FDW-DCK    Document 35    Filed 12/06/23    Page 5 of 18

driver needed to instantly stop. Defendant's counsel also cast doubt upon the seriousness of the failure to stop by pointing out the relatively short distance over which Defendant did not stop. Defense counsel also implicitly questioned whether it was reasonable to believe that Defendant was impaired, based on what he pointed out to be the ease of Defendant's walking backward with his hands above his head. Defense counsel further pointed out on cross-examination that nowhere in the report that Officer Cahall wrote did he ever indicate that he smelled alcohol on Defendant.

The Government next presented the testimony of Officer Ahlers. Officer Ahlers has been employed with CMPD for four and a half years, working on the night shift. Previously, Officer Ahlers worked as a correctional officer. Officer Ahlers described how Officer Cahall radioed for backup assistance about a vehicle that left the roadway and then didn't stop after attempts to pull it over. Officer Ahlers assisted Officer Cahall by placing Defendant in handcuffs and then into the patrol car. He testified that he could smell alcohol on Defendant at that point. After Defendant had been detained in the back of the patrol car, Officer Ahlers walked towards the truck to, in his words, see if there was anything "in plain view" that would help the officers understand why Defendant didn't stop. As he approached the vehicle, Officers Ahlers described seeing a red Solo cup in plain view in the driver's side cup holder. The window on the driver's side door was open. He testified that he believed the cup to contain alcohol. Officer Ahlers testified that he attempted to signal to Officer Crittendon, who was positioned on the passenger side of the vehicle, about the presence of the red Solo cup by shining his flashlight on it for a few seconds.

Following discovery of the open container in plain view, Officer Ahlers began a full vehicle search, looking, he testified, for further evidence of alcohol. He and Officer Crittendon looked underneath the driver's and passenger's seats, in the backseat and on the floor in front of the backseat, and in both the center console and the glove compartment. During the search of the

6

center console, Officer Crittendon located a firearm. As is apparent from the body-worn camera footage, Officer Crittendon made a noise to alert the other officers to the presence of the firearm. Separately, Officer Crittendon discovered a bottle of alcohol in the backseat on the floor on the passenger side.

On cross-examination, defense counsel inquired (among other questions) as to why Officer Ahlers did not write in his report that he smelled alcohol on Defendant. See (Document No. 18-7). Officer Ahlers explained that the omission was regrettable but likely due to the fact that it was written over a week after the traffic stop.

The Government next presented the testimony of Officer Crittendon. Officer Crittendon testified that he has about twelve years of experience as a police officer. Importantly, Officer Crittendon testified that he showed up to provide assistance on a call for backup, but he was not aware of the reason for which the traffic stop was being conducted. Officer Crittendon testified that upon arriving at the scene, he approached the truck on the passenger side. He testified that the door of the truck was already open, and he observed a red Solo cup that he assumed contained alcohol in the cupholder. He also testified that he could smell alcohol from outside the truck upon walking up to it.

On cross-examination, defense counsel pressed Officer Crittendon about his failure to mention to another officer that he smelled alcohol in the truck. Officer Crittendon responded that it seemed obvious to him that anybody who observed the open container would not also need to be informed that Officer Crittendon smelled alcohol. Notably, Officer Crittendon testified that he did indicate in his report that he smelled alcohol.

Both the Government and the defense then presented closing argument. The Government argued that the stop was legal based on unsafe driving with Defendant running off the road, nearly

hitting a mailbox, and then failing to stop after repeated attempts on law enforcement's part on a quiet street to stop the vehicle. The search of the car was justified, the Government argued, based upon the automobile exception to the warrant requirement. Given that Officer Ahlers observed what appeared to be an open container in the driver's side cupholder and smelled alcohol while standing next to the truck, and given the other facts that he knew – that Defendant had driven off the road and failed to stop – there was probable cause to search the car for other evidence of an open container violation. In the course of that search, the Government argued, once a firearm was seized, the investigation evolved from one concerning open containers to one about a gun. Defendant, on the other hand, argued that the stop was invalid and that the search was not justified under the automobile exception because there was no probable cause to search for evidence of an open container violation. Defendant highlighted that the officers' credibility about whether they actually saw the red Solo cup or smelled alcohol prior to beginning the search was a legitimate issue that would, he argued, invalidate the justification for the search of the car.

### III. STANDARDS OF REVIEW

An officer may stop and briefly detain a person for investigative purposes (known as an investigative or Terry stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu, 534 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989).

8

Reasonable suspicion means something "more than an 'inchoate and unparticularized suspicion or 'hunch''" but "less…than probable cause." Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27). In order to meet this burden, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," establish reasonable suspicion of criminal activity. Terry, 392 U.S. at 21. The Fourth Circuit describes the reasonable suspicion standard as a "commonsensical" one, thus giving credit to "the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). Courts evaluating the totality of the circumstances to determine whether an officer had reasonable suspicion can credit as one factor in such analysis officers' "own experiences and specialized training [allowing them] to make inferences from and deductions about the cumulative information available." Arvizu, 534 U.S. at 266. The standard is not an exacting one – given that "the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous." Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001).

The Supreme Court has described "probable cause" to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). However, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232.

The probable cause standard does not:

> require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

9

Taylor v. Farmer, 13 F.3d 117, 121-22 (4th Cir.1993); accord Ornelas v. United States, 517 U.S. 690, 696 (1996) (probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found").

Furthermore, the Fourth Amendment is implicated in traffic stops of vehicles. "A traffic stop of a vehicle constitutes a seizure within the meaning of the Fourth Amendment and is permissible if the officer has probable cause to believe a traffic violation has occurred…or a reasonable suspicion of unlawful conduct." United States v. Wheeler, 317 F. App'x 298, 299 (4th Cir. 2008); see also United States v. Armstrong, 2023 WL 5198773, at *2 (4th Cir. 2023) ("[a] police offer may conduct a traffic stop of a vehicle based upon the officer's reasonable suspicion that a traffic violation has occurred" (citing Kansas v. Glover, 140 S. Ct. 1183, 1187-88 (2020)). This is true regardless of whether the officer's motivations for the traffic stop are larger than the mere traffic violation itself – that is, having to do with suspicion of greater criminal activity. See United States v. McCoy, 2018 WL 1144591, at *2 (W.D.N.C. Mar. 2, 2018) (citing United States v. Whren, 517 U.S. 806, 813 (1996) ("[t]he officer's subjective motivation in making the stop is unimportant; it only matters whether the basis for the stop was objectively reasonable")).

One exception to the warrant requirement is the automobile exception. Pursuant to the automobile exception, "warrantless searches are permissible under the Fourth Amendment if a vehicle is 'readily mobile' and if probable cause exists to believe it contains contraband or evidence of a crime." United States v. Harris, 3:22-CR-018-FDW-SCR, 2023 WL 5994638, at *6 (W.D.N.C. Sept. 15, 2023) (citing Maryland v. Dyson, 527 U.S. 465, 266 (1999)). "If there is probable cause to believe a vehicle contains evidence of criminal activity," the automobile exception "authorizes a search of any area of the vehicle in which the evidence might be found."

10

Arizona v. Gant, 566 U.S. 332, 347 (2009) (citing United States v. Ross, 456 U.S. 798, 820-21 (1982)).

## IV. DISCUSSION

There are two issues presented by "Defendant's Motion To Suppress And Memorandum Of Law" (Document No. 18): (1) did law enforcement have reasonable suspicion to conduct a traffic stop, and (2) was the search of Defendant's vehicle that resulted in the seizure of the firearm lawful?[1] For the reasons explained below, the Court will conclude that CMPD had reasonable suspicion of unsafe driving based upon observation of a vehicle running off the road and nearly striking a mailbox to conduct a traffic stop. Subsequently, the Court will also conclude—again, for the reasons explained below—that the search of Defendant's vehicle was lawful based upon the automobile exception and the investigation of open container violations. At the outset, the Court observes that law enforcement's conduct during this investigation was in no way exemplary. The way in which this stop was conducted – with a police officer, firearm drawn, profanely ordering an individual to get on his bare knees on pavement and calling four officers as backup who conducted a roving search of Defendant's vehicle – is disappointing. Nevertheless, based upon the Court's examination of the facts and the law, the undersigned will recommend, as explained below, that Defendant's motion be denied. At its core, this case presents a lawful stop justified by reasonable suspicion of a traffic violation and a lawful search of a vehicle justified by the automobile exception and probable cause of an open container violation, considering what Officers Ahlers and Crittendon knew at the time of the search.

---

[1] The undersigned will not discuss or analyze whether Defendant was interrogated without the requisite Miranda warnings under the Fifth Amendment. Although Defendant discusses this issue in his motion, the Government contends that it "does not intend on relying on any statements Gibson made the night of his arrest…[and thus,] this portion of Gibson's motion is moot." (Document No. 22, p. 8); see also (Document No. 18, p. 30). Given this concession by the Government, the undersigned finds that it is not necessary to analyze this issue.

11

1. The Stop

Defendant's counsel attempted, it seems, for the first time at the hearing to argue that Officer Cahall's stop of Defendant's vehicle was unlawful. Respectfully, the exact basis for this argument is not clear to the Court. Nonetheless, based on the law and evidence presented, the undersigned concludes that the stop was lawful. To conduct a traffic stop, a law enforcement officer need only have "reasonable suspicion that a traffic violation has occurred." Armstrong, 2023 WL 5198773, at *2.

Here, Officer Cahall testified that he saw a vehicle traveling in the opposite direction run off the road, nearly strike a mailbox, and then return to the road. Officer Cahall attempted to initiate a traffic stop, through the use of lights and sirens, and Defendant proceeded through various stop signs, in what Officer Cahall assumed was an attempt to avoid stopping entirely. At that point, based on his own observations, Officer Cahall had more than sufficient reasonable suspicion to conduct a traffic stop on account of observations of traffic violations – based both on the unsafe driving and the failure to stop in a reasonable amount of time. Two and a half minutes elapsed and Defendant drove past three stop signs until coming to a final stop, all preceded by Defendant running off the road. See United States v. Smith, 396 F.3d 579, 585 (4th Cir. 2005) ("when law enforcement officers observe conduct…such as unsafe or erratic driving or behavior indicating that the driver is trying to hide from officers[,] police may take that behavior into account in determining whether there is reasonable suspicion to stop the vehicle and investigate the situation further"); and United States v. Ohangbon, 434 F. App'x 299, 301 (4th Cir. 2011) ("North Carolina law provides that drivers ensure their movements can be made in safety," which applies to erratic driving) (citing N.C. Gen. Stat. §§ 20-146(d)(1), 20-154(a)). Based on the law and facts, the undersigned respectfully recommends that the stop be found constitutional.

12

Case 3:23-cr-00091-FDW-DCK    Document 35    Filed 12/06/23    Page 12 of 18

**2. The Search**

Defendant argues that the officers' search of the vehicle was unconstitutional, not supported by probable cause, and unjustified by any exception to the warrant requirement. The Government, on the other hand, contends that the automobile exception to the warrant requirement justified Officers Ahlers and Crittendon's search of Defendant's truck. Respectfully, while the undersigned concludes that the way in which the search was conducted was imperfect, that does not mean that there was a constitutional problem.

Pursuant to the automobile exception to the warrant requirement, "police may search a vehicle without a warrant if 'probable cause exists to believe it contains contraband' and the vehicle is 'readily mobile.'"[2] United States v. Murphy, 405 F. App'x 791, 792 (4th Cir. 2010) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)). Moreover, under the automobile exception, law enforcement are permitted to search every part of the vehicle in which evidence of the illegal activity might be found. See United States v. Ross, 456 U.S. 798, 824 (1982) ("[t]he scope of a warrantless search of an automobile…is defined by the object of the search and the places in which there is probable cause to believe that it may be found").

Defendant attempts to argue that United States v. Graham applies to this case. 686 F. App'x 166, 174 (4th Cir. 2017); see (Document No. 18, p. 16). In Graham, the Fourth Circuit reversed the district court's denial of a motion to suppress. Id. at . 174-75. While the automobile exception theory was not, in fact, the theory on which the district court proceeded in order to deny the motion to suppress, the Fourth Circuit discussed it nonetheless as the Government argued that it applied on appeal. In that case, the officer who searched the car was not "even aware of the []

---

[2] The undersigned will not discuss the two other theories that Defendant's brief suggests do not apply (such that if they did apply, the search would be justified). The Government proceeds only on the automobile exception theory to justify the search, and the undersigned similarly finds that this exception to the warrant requirement is the only theory that applies to this case.

13

open containers" in the car. Id. at 174. For that reason, the presence of two beer cans could not provide probable cause to search the car because the officer who saw the beer cans in plain view was not the same officer who searched the car and recovered the firearm that provided the basis for the felon in possession of firearm charge. Id. at 167-68, 174.

Here, Officer Ahlers and Officer Crittendon testified that they *were* aware of the presence of the supposed open container – the red Solo cup – before they began their search. That fact is different than the facts in the Graham case, as stated above, in which there was no evidence that the officer who searched the car actually observed open containers (again, the reversal was on other grounds). Id. at 174. Defendant attempts to suggest that the body-worn camera footage paints a different picture. In the video, when Officer Cahall asks whether the red Solo cup in the driver's side cupholder is an open container, Officer Crittendon begins rummaging through the items on the passenger floorboard. Officer Cahall then makes it clear that he is not referring to anything on the passenger floorboard but rather to the red Solo cup. Officer Ahlers then picks up the red Solo cup. Defendant's counsel suggests that this exchange implies that Officers Ahlers and Crittendon – who had already searched the car and seized the firearm from the center console – had not previously seen the red Solo cup, and thus, any justification for searching the car based on probable cause of an open container violation was nonexistent. The undersigned has watched the body-worn camera footage and heard the testimony of the officers who testified that they affirmatively saw the red Solo cup, which they believed to contain alcohol, immediately upon looking into the truck. Further, the undersigned finds that it would be extremely difficult *not* to see the red Solo cup in the driver's side cupholder. It is immediately apparent in the video footage, and combined with the officers' experience on the night shift, dealing with many open container

14

violations, the reasonable assumption is that a red Solo cup in a cupholder at a late hour of the night could contain alcohol.

The undersigned further finds, consistent with the Government's brief, that Officers Ahlers and Crittendon possessed even more information than simply having spotted in plain view the red Solo cup in the driver's side cupholder. Officer Ahlers, at least, knew that he was called to the scene because Defendant had swerved off the road into a ditch, almost striking a mailbox, did not stop after Officer Cahall's activation of lights and sirens for a couple of minutes, and he smelled alcohol on Defendant. See (Document No. 22, p. 13). Officer Crittendon, on the other hand, testified that he not only saw the red Solo cup upon walking up to the truck, but he also could smell alcohol from where he was standing. Considering these factors, the undersigned finds that taken together these facts provided Officers Ahlers and Crittendon with probable cause to search the vehicle for open containers. See United States v. Howton, 260 F. App'x 813, 817 (6th Cir. 2008) (finding that probable cause existed to search for other open containers once an open container was observed); Lender, 985 F.2d at 154 (law enforcement may draw on their practical experience in forming an opinion as to whether sufficient indicia of criminal activity exist to support reasonable suspicion); United States v. Shine, 3:21-CR-160-MOC-DSC, 2022 WL 1213615, at *9 (W.D.N.C. Apr. 25, 2022) (finding that an officer had probable cause to search for an open container violation after observing passenger drinking from a beer can and observing a second beer can) (collecting authority).

Defendant attempts to rebut the Government's probable cause argument by pointing to the video evidence that he argues dispels the idea that Defendant was driving under the influence. Specifically, Defendant points to both his ability to walk backwards without issue when asked by Officer Cahall and his cooperative demeanor, more generally, that the video evinces. See

15

(Document No. 18, p. 22). Nonetheless – considering the other evidence that Officer Ahlers and Crittendon were aware of – the mere fact that Defendant was cooperative and able to walk backwards would not completely eviscerate suspicion of an open container violation. Any level of intoxication is illegal when an open container is present in a car, and thus, Defendant's argument is unavailing. N.C. Gen. Stat. § 20-138.7(a).

Finally, the undersigned finds that United States v. Teasley, 3:22-CR-083-FDW-DCK, 2023 WL 2599019 (W.D.N.C. Mar. 22, 2023) is not relevant to this case. In contrast to Defendant's argument that law enforcement here "abandoned" the purpose of the stop and thus "unlawfully prolonged" it, the undersigned concludes that in fact, this case presents facts showing that officers expeditiously pursued their search for open container violations. (Document No. 27, pp. 5, 18). A firearm was found in the center console, at which point the case became a felon in possession of a firearm case following the discovery of Defendant's status as a felon. The case simply evolved – the original mission was not abandoned, as Defendant would put it. As the Government states, "[t]he search of Gibson's truck by Officers Ahlers and Crittendon expedited, not delayed, Officer Cahall's investigation of the traffic stop." (Document No. 32, p. 1). Officer Cahall's placing of Defendant in the back of the patrol vehicle was reasonable, given his testimony that he believed Defendant to be armed and dangerous and the circumstances of the stop. See United States v. Douglas, 522 F. App'x 125, 128 (3d Cir. 2013); United States v. Navarrete-Barron, 192 F.3d 786, 791 (8th Cir. 1999) ("the limits of a *Terry* stop were also not exceeded when the defendant was handcuffed and placed in a police car while the officers searched the truck"); Pierre v. Clarke, 2021 WL 1061204, at *4 (E.D. Pa. Mar. 19, 2021) ("[p]lacing a driver in the rear of a patrol car does not transform an otherwise lawful investigatory stop into an arrest, provided officers have reasonable suspicion that criminal activity may be afoot"). The entire incident lasted

16

only seventeen minutes, approximately ten of which were spent researching with dispatch Defendant's criminal history. Id. at p. 3.

## V. CONCLUSION

The facts and legal issues here are thus straightforward. Law enforcement had reasonable suspicion to make a traffic stop of Defendant Gibson's vehicle based on the observation of unsafe driving when Defendant ran off the road, nearly striking a mailbox. Once stopped – after Defendant displayed unusual behavior in not stopping for over two minutes – law enforcement were permitted to briefly detain Defendant in the back of a patrol vehicle based on a belief that he was armed and dangerous and could walk up to his car to search for evidence of criminal activity in plain view. Officers observed a red Solo cup in the driver's side cupholder and smelled alcohol both in the car and on Defendant's person. Coupled with the erratic driving, law enforcement possessed probable cause to search Defendant's vehicle for an open container violation and to seize a gun once one was found. The entire encounter was thus consistent with the Fourth Amendment.[3]

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that "Defendant's Motion To Suppress And Memorandum Of Law" (Document No. 18) be **DENIED**.

## V. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days**

---

[3] The undersigned notes, as at the outset of the discussion, that law enforcement's conduct with respect to this stop and search could have been much improved. Nonetheless, poor execution of a traffic stop and vehicle search does not automatically render such stop and search unconstitutional; the core facts and the applicable law here demonstrate that this encounter was constitutional.

17

of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Id. "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

**IT IS SO RECOMMENDED**.

Signed: December 6, 2023

David C. Keesler
United States Magistrate Judge